## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DARRYL DAVIS, et al., | : | |
| | : | |
| Plaintiffs, | : | Civ. No. 15-6943 (KM) (JBC) |
| | : | |
| v. | : | |
| | : | |
| SHERRY YATES, et al., | : | **OPINION** |
| | : | |
| Respondents. | : | |
| | : | |

## KEVIN MCNULTY, U.S.D.J.

### I.   INTRODUCTION

The plaintiffs, Darryl Davis and Steven Grohs, are civilly committed persons currently residing at the Special Treatment Unit ("STU") in Avenel, New Jersey. They are proceeding *pro se* with an amended civil rights complaint filed pursuant to 42 U.S.C. § 1983. (DE 31.) Presently pending before this Court is the motion of defendants Sherry Yates and Sarah Davis for summary judgment. (DE 113.) (When necessary for clarity, Darryl Davis will be referred to as "Plaintiff Davis" and Sarah Davis will be referred to as "Defendant Davis.") For the following reasons, the motion will be denied in part and granted in part.

### II.   BACKGROUND

#### a.   Factual Background

At the STU, the heating system is generally activated each year from October 15th to April 15th. (DE 31, ¶ 5; DE 113-2, ¶ 5.) During the winter months of 2014 and into early 2015, the heating system in STU's South housing unit was not functioning properly. (DE 31, ¶¶ 5-24; DE 113-2, ¶¶ 18-25; DE 124-2, at 9.) Plaintiffs allege that the system was turned on in October 2014 and that at some point the ventilation system shut down, allowing cold temperatures from

outside to penetrate their housing unit. (DE 31, ¶¶ 23-24; DE 124-2, at 214-16, 239, 241.)

Plaintiffs allege that, for several days, their housing unit was "freezing cold." (DE 124-2, at 217, 242, 265, 269.) Plaintiffs state the temperature was so low that they were able to see their breath when they exhaled. (*Id.* at 217, 242.) Plaintiffs allege that officers in the south housing unit of the STU brought in space heaters and placed them near their desks during this time. (*Id.* at 216, 241.) Plaintiff Grohs states that as a result of the freezing temperatures, he suffered from dry, cracked skin, cold and flu-like symptoms, and emotional distress. (DE 113-16, at 3-4.) Plaintiff Davis states that he suffered from "cold-like symptoms." (DE 113-10, at 9.)

Plaintiffs allege that in December 2014 Defendant Davis visited the STU's South housing unit and provided residents with extra blankets. (DE 124-2, at 213, 239; DE 113-13, at 2.) Plaintiffs state that they each "personally and verbally" informed Defendant Davis about the freezing temperatures and lack of adequate heat when she visited. (DE 124-2, at 215-16, 241-42.) Plaintiff Grohs contends that when Defendant Davis offered him a wool blanket, he advised her that he was allergic to wool and requested a cotton blanket instead. (*Id.* at 216.) Defendant Davis allegedly stated she would look into the matter. (*Id.*) It is undisputed that after Plaintiff Grohs submitted a remedy request form for a non-wool blanket, but the request was refused because his medical chart did not indicate an allergy to wool. (DE 113-2, ¶¶ 30-34; DE 113-13, at 2; DE 124, ¶¶ 30-34.) Ultimately, however, Plaintiff Grohs states he never received any extra blanket, whether cotton or wool. (DE 124-2, at 216.) Plaintiff Davis alleges he never received an extra blanket from Defendant Davis. (DE 31, at ¶ 30; DE 124-2, at 242.)

Defendants' statement of material facts indicates that Defendant Davis visited the STU in December 2014 and provided residents with blankets. Defendant Davis herself, however, testified that she does not recall this visit. (DE 113-7, at 3; DE 124-2, at 167.) Defendant Davis

also testified that she "did not distribute extra blankets to residents on South housing." (DE 124-2, at 167.)

Plaintiffs allege that Defendant Yates also visited the South housing unit during the time when the unit was "freezing cold." (DE 31, ¶ 35; DE 124-2, at 241, 239.) Plaintiffs contend that when both Defendant Davis and Defendant Yates visited the housing unit, they would have seen the STU officers' personal space heaters, which were in plain sight. (DE 31, ¶ 53;[1] DE 124, at 216, 241.)

Defendants appear to concede that there were problems with the heating system in the STU during the winter of 2014. (DE 113-1, at 15 ("While the STU suffered heating problems..."); DE 113-2, ¶¶ 18-25 (listing records which indicate request for repairs to the heating system were made on several occasions).) However, Defendants contend that if and when temperatures in the STU declined, internal STU maintenance staff were called to inspect and maintain the unit. (DE 113-8, at 3; DE 113-9, at 3.) Outside contractors were also called to provide maintenance. (DE 113-11, at 2-9.) Defendants state that between the months of November 2014 and March 2015, an outside maintenance company, George S. Hall, Inc. ("GSH"), was called at least nine times to attend to heating issues in the STU. (*Id.*) Between the months of November 2014 and February 2015, several internal work order requests were also submitted for maintenance of the heating units. (DE 113-12, at 2-11.) Defendants submit that the maintenance records do not indicate they were personally involved with "assigning, reviewing or completing work orders for the STU." (DE 113-2, ¶¶ 15-16; *see generally* DE 113-11 & DE 113-12.)

---

[1]     There are two paragraphs numbered "53." (DE 31, at 15-16.) For clarity, the paragraph cited to here is the second paragraph 53, located on page 16.

3

It is undisputed that on April 17, 2017, Plaintiff Grohs signed a settlement agreement in the case of *Grohs, et al. v. State of New Jersey, Dep't of Corr., et al.*, Dkt. No. 2:12-CV-00905 (D.N.J.). (DE 113-14.) What is disputed is whether that settlement agreement releases Grohs's claims in this action. Grohs argues that the settlement and release pertained only to four cases listed in the agreement, and not to this one. (DE 124-2, ¶ 22.)

### b. Procedural Background

Plaintiffs initiated this action in the Superior Court of New Jersey, Law Division, Middlesex County on July 24, 2014. (DE 1.) In addition to Defendant Yates and Defendant Davis, the original complaint named the New Jersey Department of Corrections ("NJDOC") and "SCO John Doe." On August 18, 2015, Defendants removed this action to federal court. (*Id.*) Plaintiffs filed a motion to remand the action to state court, which was denied. (DE 19.)

On November 13, 2015, Defendant Yates, Defendant Davis, and the NJDOC filed a motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (DE 9.) The motion to dismiss was granted in part and denied in part. (DE 23.) The claims against the NJDOC were dismissed with prejudice since the NJDOC is not a "person" for purposes of Section 1983 liability. (DE 22, at 8.) The claims for monetary damages against both Defendant Yates and Defendant Davis in their official capacities were dismissed with prejudice because a state official sued in his or her official capacity for monetary damages is not a "person" for purposes of Section 1983. (*Id.*) The claim for injunctive relief against Defendant Yates in her official capacity and the claim for monetary damages against Defendant Yates in her individual capacity were dismissed without prejudice because Plaintiffs failed to state a claim upon which relief could be granted. (DE 23, at 1.) However, the claim for injunctive relief

4

against Defendant Davis in her official capacity and the claim for monetary damages against Defendant Davis in her individual capacity were permitted to proceed. (*Id.* at 2.)

In October 2016, Plaintiffs filed an amended complaint against Defendant Davis, Defendant Yates, and "SCO John Doe" seeking monetary damages and injunctive relief. (DE 31, at 3.) The amended complaint raises the following claims: "Count I Asserted, Pursuant to 42 U.S.C. § 1983, Against Defendant Yates, Davis and Doe for Violating Plaintiff Davis' and Grohs' Fourteenth Amendment Rights From the Failure to Provide Safe Conditions of Confinement" and "Count II Asserted, Pursuant to 42 U.S.C. § 1983, Against Defendants Yates, Davis and Doe for Violating Plaintiff Davis' and Grohs' Fourteenth Amendment Rights Stemming From Their Abuse of Power." (DE 31, at 13, 31.) On November 25, 2016, Defendant Davis and Defendant Yates filed a motion for partial dismissal of the amended complaint. (DE 33.) Defendants argued that Count II failed to state a claim upon which relief may be granted and that all claims against Defendant Yates should be dismissed because Plaintiffs had not adequately alleged her personal involvement in the alleged violations. (DE 38, at 4.) The motion was denied. (DE 39.) I noted by the way in that Opinion that "Count II might well be duplicative of Count I. As this matter proceeds, the claims might be streamlined." (*Id.* at 8.) On August 1, 2019, "SCO John Doe" was dismissed from the case without prejudice upon a joint consent order. (DE 118.)

On July 1, 2019, Defendants filed this motion for summary judgment. (DE 113.) Defendants' motion includes, among other things, a statement of material facts which are said to be undisputed. (DE 113-1, at 13; DE 113-2.) As is proper, each such fact is cited to a specific portion of the evidentiary record appended to the motion. *See* L. Civ. R. 56.1(a) ("On motions for summary judgment, the movant shall furnish a statement which sets forth material facts as to

which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion.").

Plaintiffs filed their opposition to the motion on December 13, 2019. (DE 124.) Plaintiffs' opposition consists of a brief, a declaration of Plaintiff Grohs, exhibits, and Plaintiffs' responsive statement of material facts. (*Id.*) As is proper, Plaintiffs' responsive statement of material facts cites to specific portions of the evidentiary record. *See* L. R. Civ. P. 56.1(a). A letter from Plaintiff Grohs's court-appointed *pro bono* counsel in *Grohs, et al., v. State of New Jersey, Dep't of Corr., et al.*, Dkt. No. 2:12-CV-00905, regarding the settlement agreement in that case is also submitted. (DE 122.)

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude the Court from granting a motion for summary judgment. *See id.*

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A party asserting that a fact [is not] genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents ..., affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other

6

materials." Fed. R. Civ. P. 56(c)(1)(A). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (*quoting Anderson*, 477 U.S. at 249-50) ). "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250-51.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.' " *Marino v. Indus. Crating Co.*, 358 F. 3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In that respect, the Court's role in deciding a motion for summary judgment is simply "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## IV. ANALYSIS

### a. Plaintiff Grohs's Settlement Agreement

There is a threshold issue as to one of the two plaintiffs. Defendants submit that they are entitled to summary judgment against Plaintiff Grohs because he previously entered into a settlement agreement which precludes his claims in this case. (DE 113-1, at 36.) Grohs responds that the settlement agreement only pertained to the four cases listed in the agreement, and that the list did not include the present case.

Generally, the principles of contract law govern the enforceability of a settlement agreement. *See W.B. v. Matula*, 67 F.3d 484, 497 (3d Cir. 1995), *abrogated on other grounds*, *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007). However, "different rules govern ... review of cases in which a person allegedly waives civil rights claims." *W.B.*, 67 F.3d at 497 (citing *Cirillo v. Arco Chem. Co.*, 862 F.2d 448, 451 (3d Cir. 1988)). In such cases, the court must look to the totality of the circumstances surrounding the execution of the settlement agreement and must "decline to enforce the agreement unless its execution was knowing and voluntary." *Id.* (citing *Cirillo*, 862 F.3d at 451); *see also Clark v. Vernon*, 228 F. App'x 128, 132 (3d Cir. 2007). The Third Circuit has instructed courts to consider whether:

> (1) the language of the agreement was clear and specific; (2) the consideration given in exchange for the waiver exceeded the relief to which the signer was already entitled by law; (3) the signer was represented by counsel; (4) the signer received an adequate explanation of the document; (5) the signer had time to reflect upon it; and (6) the signer understood its nature and scope. We may also look to whether there is evidence of fraud or undue influence, or whether enforcement of the agreement would be against the public interest.

*Allah v. Evanko*, Civ. No. 04-1197, 2010 WL 2698324, at *2–3 (W.D. Pa. July 7, 2010) (quoting *W.B.*, 67 F.3d at 497).

Here, Plaintiff Grohs concedes that he was represented by court-appointed *pro bono* counsel when he entered into the settlement agreement; that he read and signed the agreement of his own free will; and that he was not coerced into signing the agreement. (DE 124, ¶¶ 36-39; DE 113-15, at 3-6.) That appointed counsel, it is true, has sent a letter to the Court stating the following:

> The Settlement Agreement was negotiated at length before the Hon. Steven C. Mannion and resolves only actions enumerated therein. This action, Darryl Davis, et al. v. Sherry Yates, et al., was not included as part of the Settlement Agreement.

(DE 122) At best, however, this establishes a unilateral understanding that is at odds with the parties' objectively expressed intent, as embodied in the plain language of the Agreement itself.

The agreement in question is titled "SETTLEMENT AGREEMENT AND UNCONDITIONAL GENERAL RELEASE." The language of the release in the agreement is broad and unconditional:

> 1. **Releasor and Releasees**: This SETTLEMENT AGREEMENT AND UNCONDITIONAL RELEASE (the "Release") dated as of 4/17/2017, is given by **Stgeven Grohs** ("Releasor" hereinafter referred to as "I" or "Me"). If more than one person signs the Release, "I" shall mean each person who signs this Release. Releasees are the **State of New Jersey Department of Corrections** including ALL of its divisions, agencies, officials, employees and agents, past and present, including, but not limited to **Commissioner Gary Lanigan, Meg Yataro, SCO Jackson, SCO D'Amico, Sherry Yates, SCO Geraldine Frattalone, and SCO William Datz** hereinafter referred to as "You."

> 2. **Release**: I release and give up any and ALL claims and rights which I may have against You. This releases ALL claims, demands, damages, causes of action, or suits which have been or could have been related to the events that gave rise to the Complaint. This releases ALL claims, including those of which I am not aware and those not mentioned in this release. This Release applies to ALL claims resulting from anything which has happened up to now, including but not limited to, ALL claims that were or could have been brought in the actions entitled **Carson v. Department of Corrections, et al, 16-05163; Grohs v. D'Amico, et al., 09-7870; Grohs v. Holmes, et al., 13-7879; and Grohs v.**

9

**Yatauro, et al.**, **12-905** in the District Court of New Jersey.[2] This Release includes ALL claims involving any continuing effects of actions or practices which arose prior to the date of this Release and I release the use in any way of any past action or practice in any subsequent claim.

(DE 113-14, ¶¶ 1 & 2 (emphasis in original).)

The Release is "unconditional." It provides that Plaintiff Grohs releases "ALL claims, including those of which I am not aware and those not mentioned in this release. It releases "ALL claims resulting from anything which has happened up to now." While the Release cites four pending cases in particular, and explicitly releases claims that were or could have been brought in those cases; it clearly states, however, that the released claims are "included, *but not limited to*" those that were or "could have been brought" in the four enumerated cases. (DE 113-114, ¶ 2 (emphasis added).) The parties being released ("You") include the Department of Corrections and all of its agents, past and present.

The language could hardly be broader, or more clear. The defendants were buying peace with respect to Mr. Grohs, a very frequent litigant against them.[3] There was consideration in the form of a modest cash payment.

Under the circumstances, I must find that the plain language of the Agreement, in the surrounding circumstances, encompasses the claims asserted here. The settlement was signed as

---

[2]     *Carson v. Department of Corrections, et al*, 16-05163 (SDW), was a conditions-of-confinement claim involving inadequate laundry facilities at the STU in 2014.

*Grohs v. Holmes, et al.*, 13-7879 [probably a typo for 7870] (KM), involved claims of inadequate law-library and other facilities, and First Amendment retaliation.

*Grohs v. Yatauro, et al.*, 12-905 (KM) was a was a conditions-of-confinement claim involving inadequate hot water at the STU.

*Grohs v. D'Amico, et al.*, 09-7870, could not be located *via* a docket search. The reference seems to be to *Grohs v. Hayman, D'Amico*, et al., Civ. No. 09-5273 (NLH), which asserted a variety of claims of harassment by guards in retaliation for filing grievances.

[3]     The docket of this Court shows eleven such cases having Mr. Grohs as plaintiff or co-plaintiff, not all of which were currently pending at the time of the settlement. The record does not reveal whether Mr. Grohs made his counsel aware of all of them.

of April 17, 2017. The events sued upon in this action occurred in 2014–15, and surely fall within, *e.g.*, the category of "ALL claims resulting from anything which has happened up to now." Indeed, these claims probably "could have been brought" in one or more of the prior actions which were specifically listed. The claims of Plaintiff Grohs in this action were therefore extinguished by that release.

Summary judgment is therefore granted in favor of Defendants as against Plaintiff Grohs only. The claims of co-Plaintiff Davis, however, are unaffected by the release. And, to be clear, the dismissal does not imply that the testimony of Grohs is irrelevant to the remaining claims. It follows that this action, even if Grohs is no longer a named plaintiff, will look much the same. The following analysis, even where it refers to claims asserted by "Plaintiffs," should therefore be understood to apply to Plaintiff Davis.

### b. Section 1983 Conditions-of-Confinement Claim

#### i. *Constitutional Violation*

Defendants argue that the evidence adduced has failed to demonstrate they violated Plaintiffs' Fourteenth Amendment rights. (DE 113-1, at 15.) Specifically, Defendants assert Plaintiffs have failed to show that the inadequate heating in the STU amounted to punishment. (*Id.*) While Defendants acknowledge that there were heating problems in the STU, they contend that those problems were not intentional and that the STU attempted to ameliorate the cold by making repairs to the heating system and providing residents with blankets. (*Id.*)

The Due Process Clause of the Fourteenth Amendment governs conditions of confinement claims brought by individuals who are civilly committed. *See Youngberg v. Romeo*, 457 U.S. 307, 324-25 (1982) (holding that the Fourteenth Amendment, rather than the Eighth Amendment, applies to an involuntarily committed patient's claim of safe conditions of

confinement); *Artis v. McCann*, Civ. No. 11-3613, 2013 WL 2481251, at *3 (D.N.J. June 10, 2013) (stating that the rights of involuntarily committed patients "more appropriately rise under the Fourteenth Amendment" as opposed to the Eighth Amendment). The Fourteenth Amendment mandates that civilly committed individuals may not be subjected to conditions that amount to punishment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Southerland v. Cnty. of Hudson*, 523 F. App'x 919, 921 (3d Cir. 2013) (noting that the central question in deciding whether a plaintiff has sufficiently alleged a Fourteenth Amendment conditions of confinement claim is whether the conditions constituted "punishment").

To determine whether conditions of confinement amount to punishment, a court must determine whether the condition is imposed for the purpose of punishment or whether it is "reasonably related to a legitimate governmental objective." *E.D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019); *see also Bell*, 441 U.S. at 538. "Absent a showing of an expressed intent to punish on the part of the detention facility officials, that determination generally will turn on whether [the conditions have] an alternative purpose . . . and whether [they appear] excessive in relation to [that purpose]." *Bell*, 441 U.S. at 538 (internal citation and quotation marks omitted). Thus, if a condition is reasonably related to a legitimate governmental objective, "it does not, without more, amount to punishment." *Id.* (internal quotation marks omitted). If, however, a condition does not reasonably relate to a legitimate governmental objective, then a court may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflicted" upon a civilly committed individual. *See E.D.*, 928 F.3d at 307 (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).

To constitute punishment, the condition must be both serious and intentional. *See Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007).

12

> Unconstitutional punishment typically includes both objective and subjective components. As the Supreme Court explained in *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), the objective component requires an inquiry into whether "the deprivation [was] sufficiently serious" and the subjective component asks whether "the officials act[ed] with a sufficiently culpable state of mind[.]" *Id.* at 298, 111 S.Ct. 2321. The Supreme Court did not abandon this bipartite analysis in *Bell,* but rather allowed for an inference of mens rea where the restriction is arbitrary or purposeless, or where the restriction is excessive, even if it would accomplish a legitimate governmental objective. *See Bell,* 441 U.S. at 538-39 & n. 20, 99 S.Ct. 1861.

*Id.* at 68 (alterations in original) (citing *Bell,* 441 U.S. at 538-39 & n.20).

As to the "objective component," the court must consider "whether these conditions

cause inmates to endure such genuine privations and hardship over an extended period of time,

that the adverse conditions become excessive in relation to the purposes assigned to them."

*Hubbard,* 538 F.3d at 233 (internal quotation marks and citations omitted). That analysis must

encompass the totality of the circumstances within an institution. *See id.* ("In conducting this

excessiveness analysis, we do not assay separately each of the institutional practices, but

[instead] look to the totality of the conditions.") (internal quotation marks and citations omitted);

*see also Daniels v. Taylor,* Civ. No. 13–5510, 2014 WL 3955372, at *5 (D.N.J. Aug. 13, 2014)

("In analyzing whether ... conditions of confinement violate the Fourteenth Amendment, a court

considers the totality of the circumstances within an institution." (citing *Garcia v. Lancaster

Cnty. Prison,* No. 13–2018, 2014 WL 176608, at *6 (E.D. Pa. Jan. 15, 2014)); *Cruz v. Main,* Civ.

No. 10-5605, 2011 WL 3625068, at *5 (D.N.J. Aug. 15, 2011) (analyzing civilly committed

plaintiff's conditions of confinement claim using a totality of the circumstances analysis); *Wright

v. Atl. Cnty. Justice Facility,* No. 10–6101, 2010 WL 5059561, at *6 (D.N.J. Dec. 2, 2010)

(considering the totality of the alleged deprivations to determine whether plaintiff had stated a Fourteenth Amendment conditions of confinement claim).[4]

As to the "subjective component," "a plaintiff raising a Fourteenth Amendment conditions of confinement claim must show that the defendants acted with *at least* deliberate indifference to the conditions imposed upon him in order to establish liability." *Carson v. New Jersey Dep't of Corr.*, Civ. No. 16-5163, 2019 WL 2137364, at *4 (D.N.J. May 16, 2019) (emphasis added).[5] This requires a plaintiff to demonstrate that the defendants acted in a manner

---

[4]    I discussed the distinction in a prior opinion filed in a case brought by Mr. Grohs:

> The precise contours of the standard to evaluate a conditions-of-confinement claim under the Fourteenth Amendment, as opposed to the Eighth Amendment, are not crystal clear. *See* Catherine D. Starve, *The Conditions of Pretrial Detention*, 161 U. PA. L. REV. 1009, 1009 (2013) (stating that the law as it applies to pretrial detainees for which the Fourteenth Amendment is applicable is unclear and inconsistent). Nevertheless, when I consider the minimum standards applicable to convicted prisoners, I must conclude at least that "the state has no *less* of a duty to provide civilly committed persons with adequate food, shelter, clothing, medical care, and safety measures." *Grohs*, 984 F. Supp. 2d at 283 (citing *Youngberg*, 457 U.S. at 324); *see also City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (noting that the due process rights of a person are at least as great as the Eighth Amendment protections available to a convicted prisoner). Eighth Amendment standards are relevant at least to the extent that they define a floor beneath which the State cannot go. *See Grohs*, 984 F. Supp. 2d at 983 ("[I]t is true as a general matter that persons involuntarily committed are entitled to more considerate treatment and better conditions of confinement than are persons who are being criminally punished.") (citations omitted); *see also Fuentes v. Wagner*, 206 F.3d 335, 344 (3d Cir. 2000) (" 'pretrial detainees are entitled to at least as much protection as convicted prisoners, so the protections of the Eighth Amendment would seem to establish a floor of sorts.' ") (quoting *Kost v. Kozakiewicz*, 1 F.3d 176 188 n. 10 (3d Cir. 1993)).

> Therefore, while cases involving the Eighth Amendment may not be dispositive here, they do provide some guidance.

*Grohs v. Santiago*, Civ. No. 13-3877, 2014 WL 4657116, at *4 n.3 (D.N.J. Sept. 17, 2014).

[5]    In certain contexts, courts have analyzed conditions of confinement claims under a "professional judgment" standard, rather than a "deliberate indifference" standard. *See Youngberg*, 457 U.S. at 321; *see also Shaw by Strain v. Stackhouse*, 920 F.2d 1135 (3d Cir. 1990). In *Youngberg*, the United States Supreme Court analyzed a conditions of confinement claim brought on behalf of an individual who was involuntarily committed against a standard of reasonable "professional judgment." *See id.* The Court applied the "professional judgment" standard to "professional decisionmakers," which are defined as "person[s] competent, whether by education, training or experience, to make the particular decision at issue." *Id.* at 323, n.30. The Court further stated that the professional decisionmaker may be held liable, not for mere negligence, but when his or her conduct "substantial[ly] depart[s] from accepted professional

14

evincing "a reckless disregard of a known risk of harm." *Stokes v. Lanigan*, Civ. No. 12-1478, 2012 WL 4662487, at *3 (D.N.J. Oct. 2, 2012). This threshold requires more than mere negligence. *See Carson,* 2019 WL 2137364, at *4; *see also Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

Regarding cell temperatures, inmates "have a right to adequate ventilation and a right to be free from extreme hot and cold temperatures." *Kates v. Bledsoe*, Civ. No. 11-0391, 2013 WL 4417656, at *8 (M.D. Pa. Aug. 14, 2013), *aff'd*, 547 F. App'x 93 (3d Cir. 2013) (quoting *Shelby Cnty. Jail Inmates v. Westlake*, 798 F.2d 1085, 1087 (7th Cir. 1986)); *see also Crosby v. Georgakopoulos*, Civ. No. 03-5232, 2005 WL 1514209, at *6 (D.N.J. June 24, 2005) ("Prisoners have a right under the Eighth Amendment to be free from extreme hot and cold temperatures." (quoting *Freeman v. Berge*, No. 03-0021, 2003 WL 23272395, at *12 (E.D. Wis. Dec. 17, 2003))). Nevertheless, "the Constitution does not give inmates the right to be free from all discomfort." *Id.* (quoting *Shelby Cnty. Jail Inmates*, 798 F.2d at 1087). The Third Circuit has applied these principles within the context of the Eighth Amendment:

> It is apparent under [*Wilson v. Seiter*] that low cell temperatures may satisfy the objective deprivation requirement of an Eighth Amendment claim if warranted by the surrounding circumstances. Thus, whether the cell temperature, the length of the inmate's confinement in such temperatures, and the failure of prison officials to ameliorate the cold temperatures creates a sufficiently serious deprivation of the human need of adequate shelter to state a claim under the Eighth Amendment is often an issue to be determined by the trier of fact.

*Sampson v. Berks Cnty. Prison*, 171 F. App'x 382, 385 (3d Cir. 2006).[6]

---

judgment, practice, or standards." *Id.* at 314. Therefore, I consider whether Defendants have been, *at least*, deliberately indifferent.

[6]    The law in other Circuits is similar. *See Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) ("[I]t is well settled that exposing prisoners to extreme temperatures without adequate ventilation may violate the Eighth Amendment."); *Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997) ("The question, however, is not simply whether the inmate had some alternative means of warmth, but whether the alternative was adequate to combat the cold. Moreover, it is not just the severity of the cold, but the duration of the condition, which determines whether the conditions of confinement are unconstitutional."); *Corselli v.*

Here, there exist genuine disputes of material fact as to whether Plaintiffs were subjected to unreasonably cold temperatures and for how long Plaintiffs had to endure those temperatures. Plaintiffs have asserted that they were subjected to "freezing temperatures" for a several days during the winter of 2014. Plaintiffs also allege that they did not receive extra blankets, but that even if they had, the extra blankets would have been insufficient to combat the cold. Defendants have not pointed to any evidence refuting Plaintiffs' assertions about the cold temperatures, except to state that they "work[] to keep the temperatures within a comfortable level" and that they provided Plaintiffs with blankets when temperatures became cold.[7] (DE 113-8, at 3; DE 113-1, at 20 ("Plaintiffs were offered blankets to address the heating problems.") Defendants argue, however, that Plaintiffs' claim must fail because Plaintiffs "have not presented specific evidence or the temperature of the length of the temperatures." (DE 113-1, at 22.) Yet, a prisoner's attestation about freezing temperatures, at least partly corroborated by Defendants' admissions, is sufficient to create a genuine dispute of material fact. *See Jordan v. Milwaukee Cnty.*, 680 F. App'x 479, 482 (7th Cir. 2017) (holding that "prisoners' attestations of freezing temperatures during winters in the prison are enough to create a genuine dispute about the temperature of [the prisoner's] unit.") Accordingly, I find that there is a genuine dispute of material fact as to whether the deprivation was sufficiently serious.

---

*Coughlin*, 842 F.2d 23, 27 (2d Cir. 1988) (reversing grant of summary judgment where evidence demonstrated prisoner had been deliberately exposed to bitter cold in his cell for three months even where prison official had provided a blanket); *Beck v. Lynaugh*, 842 F.2d 759, 761 (5th Cir. 1988) (vacating summary dismissal of prisoners' claims that they were exposed to winter cold as a result of broken windows).

[7]    Defendants state that Defendant Davis provided Plaintiffs with blankets in December 2014. Defendant Davis herself, however, stated in response to the first set of interrogatories that she did not provide such blankets to residents on December 23, 2014. (DE 124-2, at 167.)

There also remains a genuine dispute of material fact as to whether Defendants had a sufficiently culpable state of mind. Plaintiffs assert that they "personally and verbally" advised Defendant Davis about the inadequate heating when she handed out blankets to the residents on December 23, 2014. Plaintiffs also argue that both Defendant Davis and Defendant Yates had actual knowledge of the inadequate heat based upon their visits to the STU when it "was freezing cold," and the fact that Defendants would have seen the personal space heaters officers used at their desks in the STU. Defendants do not cite to any evidence disputing that they had personal knowledge of the STU's cold temperatures. (*See generally* DE 113-1.) In fact, Defendants indicate that they did indeed become "aware" of the cold temperatures. (*Id*. at 28.) Defendants argue, however, that as "high-level administrators" at the STU, their personal involvement in managing the facility's heat was "limited." (*Id*. at 18-19.) Defendants contend that maintenance engineers were responsible for ensuring adequate heating and that "other employees in the STU's custody or administration were responsible for reporting problems and requesting maintenance." (*Id*. at 19.) Defendants cite to maintenance requests as evidence that they were not involved in "assigning, reviewing, or completing" work orders. (*Id*.) Defendants do state that, "[t]o the extent [they] were involved, they offered Plaintiffs blankets[.]" (*Id*. at 20.)

Construing the record in the light most favorable to the non-moving party, a reasonable fact finder could conclude that Defendants had actual knowledge of the cold temperatures at the STU and did nothing to ameliorate those conditions. Even if Defendant Davis did provide blankets to STU residents, it is unclear whether this alternative was adequate to combat the cold. *See Dixon*, 114 F.3d at 643 ("The question, however, is not simply whether the inmate had some alternative means of warmth, but whether the alternative was adequate to combat the cold.") Additionally, although requests for repairs to the heating system were made, Defendants

17

indicated they were not the individuals who directed or requested these repairs. Accordingly, there exists a genuine dispute as to whether Defendants showed, at the very least, deliberate indifference to the cold temperatures in the STU. Accordingly, Defendants are not entitled to summary judgment on this ground.

    *ii.    Supervisory Liability*

Defendants also argue that they cannot be held liable because Plaintiffs' claim is based upon an impermissible theory of *respondeat superior*. (DE 113-1, at 24.) Defendants submit that a claim of supervisory liability under § 1983 requires some affirmative conduct on the part of the supervisor and that Defendants here did not have the requisite personal involvement. (*Id.* at 27-28.) Defendants state that while they "became aware of cold temperatures, the evidence does not indicate any violations by any subordinates, or Defendants' knowledge or acquiescence in such violations." (*Id.* at 28.)

Section 1983 liability cannot be imposed based on a theory of *respondeat superior*. *See Alexander v. Gennarini*, 144 F. App'x 924, 925 (3d Cir. 2005) ("Section 1983 liability cannot be found solely on the basis of *respondeat superior*"). Rather, a plaintiff must allege that the defendant supervisor had personal involvement in the alleged wrongs. *See Rode v. Dellaciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). The Third Circuit has recognized two ways in which a supervisor may be shown to have had personal involvement – (a) if the supervisor either "established and maintained a policy, practice or custom which directly caused the constitutional harm," or (b) if the supervisor "participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations." *Parker v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016) (quoting *Santiago v. Warminster*, 629 F.3d 121, 129 n.5 (3d Cir. 2010)). Knowledge, for these purposes,

18

means "contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents." *C.H. ex. rel. Z.H. v. Oliva*, 226 F.3d 198, 202 (3d Cir. 2000).

Here, Plaintiffs submit that Defendant Davis had the requisite personal involvement, stating that they "verbally and personally" informed her of the cold temperatures and inadequate heating. (DE 124-2, at 213, 239.) Defendant Davis, however, testified that she does not recall any such interaction. (*Id*. at 167.) This clash in testimony necessitates a credibility determination and therefore creates a genuine dispute of material fact as to whether Defendant Davis had actual knowledge of the cold temperatures in the STU.

Plaintiffs also assert that both Defendants visited the STU when it was "freezing cold." (DE 124-4, at 213.) Defendants have not pointed to any evidence to refute this assertion and they do concede that, at some point, they "became aware of cold temperatures" in the STU. (DE 113-1, at 28.) Giving all favorable inferences to Plaintiffs as the nonmoving party, these visits to the STU when the temperatures were allegedly "freezing" is sufficient to create a triable issue as to Defendants' knowledge of the low temperatures and problems with the heat. This allegation could lead a reasonable fact finder to believe that Defendants had actual knowledge of the heating problems occurring at the STU but took no action, thereby supporting an inference of the requisite personal involvement.[8]

---

[8]     Defendants also argue that Plaintiffs' theory of supervisory liability is "barred" by the United States Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 62, 676 (2009). (DE 113-1, at 24-25.) Defendants assert that *Iqbal* "stressed that § 1983 actions could not be premised on respondeat superior." (*Id*. at 25.) In *Iqbal*, the Supreme Court held that, "[i]n a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own conduct." *Iqbal*, 556 U.S. at 677. The Supreme Court reasoned that "purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities." *Id*. at 678.

In interpreting the implications of the Supreme Court's decision, the Third Circuit has held that it does not "read *Iqbal* to have abolished supervisory liability in its entirety." *Barkes v. First Corr. Med.*,

### c. Qualified Immunity

Defendants argue they are entitled to qualified immunity not only because they did not violate Plaintiffs' constitutional rights, but also because there is no clearly established precedent regarding the "temperature needs of civilly committed residents[.]" (DE 113-1, at 29-33.) While Defendants acknowledge "scattered cases" establishing that civilly committed individuals have the right to be free from extreme temperatures, Defendants assert that these cases are non-precedential, arise out of other district courts, or deal with a different set of circumstances than are present here. (*Id.* at 33-34.)

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ray v. Twp. of Warren*, 626 F.3d 170, 173 (3d Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "[I]f a reasonable [official] is not on notice that his or her conduct under the circumstances is clearly unlawful, then application of qualified immunity is appropriate." *Id.* Qualified immunity is intended to protect "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 173–74 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L.Ed. 2d 271 (1986)).

In determining whether a governmental official is entitled to qualified immunity, a court must examine: (1) whether the facts alleged make out a violation of a constitutional right; and (2) if so, whether the right at issue was "clearly established" at the time of the defendant's alleged

_____

*Inc.*, 766 F.3d 307, 319 (3d Cir. 2014), *rev'd on other grounds*, *Taylor v. Barkes*, 575 U.S. 822 (2015). Rather, the Third Circuit has provided that, "under *Iqbal*, the level of intent necessary to establish supervisory liability will vary with the underlying constitutional tort alleged." *Id.* As discussed previously, the level of intent necessary for a conditions of confinement is that of, at least, deliberate indifference. *See Carson*, 2019 WL 2137364, at \*4. Accordingly, a theory of supervisory liability is viable if a plaintiff sufficiently alleges that a defendant had personal involvement in the alleged violation and was at least deliberately indifferent. Here, since I have found that there is a genuine dispute of material fact as to that issue.

misconduct. *See Pearson*, 555 U.S. at 232. Courts are permitted to address those prongs in either order. *See id.* at 236. Defendants bear the burden of proving they are entitled to qualified immunity. *See Thomas v. Independence Twp.*, 463 F.3d 285, 292 (3d Cir. 2006).

"Clearly established" law is demonstrated "when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). A right may still be clearly established even if there is no case law or precedent "directly on point." *See al-Kidd*, 563 U.S. at 741; *see also Jones v. Pi Kappa Alpha Int'l Fraternity, Inc.*, 765 F. App'x 802, 808–09 (3d Cir. 2019). Rather, "the ultimate inquiry is whether a reasonable official would have known that the conduct was unlawful." *Jones*, 765 F. App'x at 809.

Here, it is well settled that some level of warmth is a basic human need. *See Wilson*, 501 U.S. at 304 (holding that the Eighth Amendment is violated when a condition of confinement results in "the deprivation of a single, identifiable human need such as food, warmth, or exercise"); *see also Jordan*, 680 F. App'x 479, 483 (7th Cir. 2017) ("it has long been settled that failing to provide adequate warmth to inmates violates their constitutional rights"). The Third Circuit has held that, "[i]t is apparent under [the Supreme Court's decision in] *Wilson* that low cell temperatures may satisfy the objective deprivation requirement of an Eight[h] Amendment claim if warranted by the surrounding circumstances." *Sampson*, 171 F. App'x 382.

Defendants here urge that there is no case law which defines "how long" the cold temperatures must persist before they rise to a constitutional violation, or "what conditions necessitate repairs to heating systems." Still, it appears that any reasonable government official should have known that exposing civilly committed individuals to extreme temperatures for a

21

period of time was unlawful. And that is what is alleged in the Plaintiffs' proofs—*i.e.,* that Plaintiffs were exposed to "freezing" temperatures for several days.

To be sure, it would appear that any damages are limited; the duration of the violation is limited, and no physical aftereffects, aside from cold and flu-like symptoms, are alleged. Still, I cannot find on this record that a reasonable official would not have known that Plaintiffs' rights were being violated. Defendants have not offered their own evidence as to the temperatures in the cells or the duration of such exposure. On the record before me, I do not find that Defendants are entitled to qualified immunity at this time.

### d. Claims Against Defendant Davis in her Official Capacity

Defendants submit that the official-capacity claims against Defendant Davis must be dismissed because only the caption of the complaint indicates that Defendant Davis is being sued in her official capacity. (DE 113-1, at 42.) The body of the complaint, they say, contains no such claim. (*Id.*) There are references, they acknowledge, to the official capacity of Yates, but not to that of Davis. (*Id.*; DE 31, at 3.) In response, Plaintiffs concede that Defendant Davis, in any event, is no longer employed at the STU, so that their claims against her for injunctive relief may "at this point in time, be invalid" and "may be dismissed." (DE 124-1, at 52.) Plaintiffs raise the possibility that Defendant Davis may "become[] re-employed at the STU in the future." (*Id.*)

A court must, of course, "look beyond the phrasing of the caption and focus on the substance of the Complaint and the course of the proceedings." *Cullen v. Pennsylvania Dep't of Corr.*, Civ No. 09-1562, 2012 WL 6015721, at \*1 (W.D. Pa. Dec. 3, 2012) (citing *Melo v. Hafter*, 912 F.2d 628, 635 (3d Cir. 1990); *see also Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) ("In many cases, the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both. 'The course of proceedings' in such cases typically

will indicate the nature of the liability sought to be imposed." (quoting *Brandon v. Holt*, 469 U.S. 464, 469 (1985))). Viewing the case file as a whole, I do not find any sufficient indication that Plaintiffs intended to sue Defendant Davis in her official capacity for injunctive relief. (*See* DE 31, at 24-32 (delineating damages for individual capacity claims for Defendant Yates and Defendant Davis, but asserting official-capacity injunctive claim only against Defendant Yates); *see also* DE 124-1, at 52 (conceding that any official capacity claim against Defendant Davis may be dismissed)).

Additionally, since Defendant Davis no longer works at the STU, any claim against her for injunctive relief would be moot, as she would not be in a position to effect any such relief. *See Harris v. Holmes*, Civ No. 14-460, 2019 WL 291147, at *1, n.5 (D.N.J. Jan. 23, 2019) (stating that the Court could not grant injunctive relief against a former employee of the New Jersey Department of Corrections for violating a plaintiff's rights under the First Amendment's Free Exercise Clause and Fourteenth Amendment's Equal Protection Clause because the employee no longer worked there); *see also Parthemore v. Knipp*, Civ. No 11-1829, 2013 WL 3941996, *2 n.1 (E.D. Cal. July 20, 2013) ("[W]hen an inmate seeks injunctive relief against a prison official who is no longer employed at the institution at which he is incarcerated, his claims for such relief become moot." (citing *Alvarado v. Herndon*, Civ. No. 10-760, 2012 WL 2365894, at *8 (C.D. Cal. Mar. 28, 2012))). The possibility of her re-employment by STU is speculative at best.

Accordingly, to the extent any claim against Defendant Davis in her official capacity for injunctive relief has been alleged, it will be dismissed as moot.

### e. Duplicative Counts: I & II

Defendants next submit that the Court should dismiss Count II of the Complaint as duplicative of Count I. (DE 113-1, at 43.) Defendants assert that the underlying allegations of both counts are the same, except for Plaintiffs' attempt in Count II to hold Defendants liable for "abuse of power." (*Id.*; DE 31, at 20.) Plaintiffs, however, argue that the two claims are distinguishable. (DE 124-1, at 53.) Count I, they say, asserts a Fourteenth Amendment conditions-of-confinement violation, whereas Count II establishes an independent cause of action under the Fourteenth Amendment for an "abuse of official power." (*Id.* at 53-54.)

At a high level of generality, § 1983 is aimed at preventing "abuses of power by those acting under color of state law." *Robertson v. Wegmann*, 436 U.S. 584, 591 (1978); *see also Giles v. Campbell*, 698 F.3d 153, 156 (3d Cir. 2012). Some underlying violation of the U.S. Constitution or state law, however, must be alleged. "[A]buse of power" is not itself "an independently cognizable claim for § 1983 purposes." *O'Bradovich v. Village of Tuckahoe*, 325 F. Supp. 2d 413, 426 (S.D.N.Y. 2004); *see also In re Copeland*, Civ. No. 18-13948, 2019 WL 1090005, at *2 (Bankr. W.D. Okla. Mar. 7, 2019) (collecting cases that state there is no freestanding cause of action for abuse of power); *Paoli v. Stetser*, Civ. No. 12-66, 2014 WL 3386037, *34 (D. Del. July 11, 2014), *report and recommendation adopted in part, rejected in part*, 2014 WL 5857567 (D. Del. Nov. 10, 2014), *aff'd*, 651 F. App'x 123 (3d Cir. 2016) ("[T]here is not a separate legally cognizable claim of 'abuse of power' under federal law."). That a defendant abused her power in the course of committing some alleged constitutional violation "adds nothing of legal significance to Plaintiffs' complaint"; "Section 1983 draws no distinction between abusive and nonabusive federal violation and does not require proof of abuse

24

of governmental power separate and apart from proof of constitutional violations." *O'Bradovich*, 325 F. Supp. 2d at 426 (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 119 (1992).

Here, Count II alleges that Defendants abused their power by failing to provide them with adequate warmth and protection from the cold. (DE 31, ¶ 74.) Since there is no independent cause of action for "abuse of power," and the claim is premised upon the same allegations and constitutional deprivations underlying Count I, I will dismiss Count II as redundant. *See Janowski v. City of N. Wildwood*, 259 F. Supp. 3d 113, 132 (D.N.J. 2017) (dismissing counts as duplicative where the counts were premised upon the same allegations and underlying facts).

### f. Damages

Finally, Defendants argue that Plaintiffs' claims for compensatory damages, punitive damages, and damages for emotional distress should be dismissed because Plaintiffs have failed to prove their injuries through expert testimony or sufficient factual allegations. (DE 113-1, at 44.) Since summary judgment has been granted against Plaintiff Grohs based upon his prior settlement agreement, I will consider only the injuries alleged by Plaintiff Davis.

Under § 1983, a plaintiff may be entitled to monetary damages for a defendant's unlawful conduct. *See* 42 U.S.C. § 1983. Claims for nominal or punitive damages do not require that a plaintiff show actual physical injury and may be awarded "based solely on a constitutional violation" since these damages are intended to "vindicate constitutional rights" or "deter or punish egregious violations of constitutional rights." *See Allah v. Al-Hafeez*, 226 F.3d 247, 251-52 (3d Cir. 2000)).[9]

---

[9] Although Plaintiffs' complaint does not specifically request "nominal damages", it is not required that a plaintiff do so. *See Allah*, 226 F.3d at 251 ("Although [plaintiff] does not expressly seek nominal damages in his complaint, this court has held that 'it is not necessary to allege nominal damages.'" (quoting *Basista v. Weir*, 340 F.2d 74, 87 (3d Cir. 1965))).

However, if a plaintiff is seeking compensatory damages, or damages for emotional injuries, then he must demonstrate physical injury. *See Mitchell v. Horn*, 318 F.3d 523, 533 (3d Cir. 2003); *see also* 42 U.S.C. § 1997(e) (providing that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury…"); *Carey v. Piphus*, 435 U.S. 247, 248 (1978) (holding that compensatory damages require proof of actual injury). For plaintiffs seeking damages for emotional distress, that physical injury need not be significant, but it must be more than *de minimis*. *See Mitchell*, 318 F.3d at 523; *see also In re Bayside Prison Litig.*, Civ. No. 09-2365, 2010 WL 4916716, at *3 (D.N.J. Nov. 23, 2010) ("[T]he prevailing view is that physical injury is an observable or diagnosable medical condition requiring treatment by a medical care professional." (internal citations and quotation marks omitted)). Although there is no bright line test as to what constitutes *de minimis* physical injury, "[d]istrict courts have been hesitant to find that an identifiable bodily injury was *de minimis* as a matter of law." *Hyman v. Giorla*, Civ. No. 10-499, 2014 WL 881137, at *6 (E.D. Pa. Mar. 5, 2014). "Courts have granted summary judgment only when the plaintiff complains of wrongful conduct but fails to produce any evidence of a bodily injury." *Id.*

Defendant are correct that there is no expert testimony to establish physical injury. Nevertheless, I find that Plaintiff Davis's deposition testimony that he suffered "cold-like symptoms" is sufficient to go forward. *See Paladino v. Newsome*, 885 F.3d 203, 209 (3d Cir. 2018) ("Indeed, 'a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment.' This is true even where . . . the information is self-serving." (quoting *Lupyan v. Corinthian Colleges, Inc.*, 761 F.3d 314, 320 (3d Cir. 2014))); *see also Wood v. Se. Pennsylvania*

*Transportation Auth.*, Civ. No. 14-4183, 2016 WL 2619411, at *7 (E.D. Pa. May 6, 2016) (stating that plaintiff's self-serving testimony was sufficient to demonstrate his physical injuries for excessive force claim). I find that whether these injuries were *de minimis* is a disputed question of fact best resolved by a jury. As a result, I do not find that Plaintiff Davis's request for compensatory damages for his physical injuries should be dismissed.

However, I do find that, based upon the record, Plaintiff Davis' request for emotional distress damages should be dismissed. Plaintiff Davis admitted in his deposition that he did *not* suffer from emotional distress as a result of the STU's cold temperatures. (DE 113-10, at 9.) The transcript of Plaintiff Davis' deposition demonstrates the following:

> Q: Are there any physical conditions that you suffer from, you know, presently due to the prior cold that you experienced?
>
> A: No.
>
> Q: Okay. What about emotional distress?
>
> A: None.
>
> Q: Was there any emotional distress that you suffered at that time?
>
> A: No.
>
> Q: Just the physical conditions?
>
> A: Yes.

(*Id*. at 9-10.)

Given Plaintiff Davis's admission that he did not suffer any emotional distress from the alleged constitutional violation, I will dismiss Plaintiff Davis' request for damages based upon emotional distress.

I also find that, based upon the record, Plaintiff Davis' request for punitive damages should be dismissed as well. In order to recover punitive damages, a plaintiff must demonstrate

that the defendant's conduct was "motived by evil motive or intent," or involved "reckless or callous indifferences to the federally protected rights of others." *Coleman v. Kaye,* 87 F.3d 1491, 1497 (3d Cir. 1996) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). "Punitive damages are only awarded … if the defendant's conduct is particularly egregious." *Gaines v. Busnardo*, Civ. No. 13-6566, 2015 WL 5771233, at *8 (D.N.J. Sept. 30, 2015) (citing *Smith*, 461 U.S. at 56); *see also Allah*, 226 F.3d at 252 (stating that the purpose of punitive damages is to deter or punish 'egregious' constitutional violations).

Here, Plaintiffs have not pled any facts that would give rise to an inference of evil motive or callous indifference. That the STU's heating system malfunctioned for a few days, even if the Defendants' response allegedly fell short of what is required, is not the type of egregious conduct that would justify an award of punitive damages. Therefore, I will dismiss Plaintiff Davis's request for punitive damages. This dismissal, however, is without prejudice to amendment if appropriate, should additional facts emerge in discovery or at any trial.

## VI.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is denied in part and granted in part. An appropriate Order will be entered.

DATED: February 3, 2020

KEVIN MCNULTY
United States District Judge

28